Thomas B. BENNETT and Bonnie Bennett, husband and wife, Plaintiffs,

v.

REAL PROPERTY SERVICES CORP., Burlington Manor Apartments, Unlimited John Doe(s) and Unlimited ABC Corporation(s), Defendants.

No. CIV. 97–5293(JBS).

United States District Court, D. New Jersey.

Sept. 29, 1999.

Kevin P. McCann, Walter H. Iacovone, Chance & McCann, Bridgeton, NJ, for Plaintiffs.

Paul L. Lincoln, Hahn & Howarth, Parsippany, NJ, for Defendants.

## OPINION

SIMANDLE, District Judge.

Plaintiffs filed the instant lawsuit claiming that, as a result of the defendants' negligence and creation of a nuisance, plaintiff Thomas B. Bennett fell while in the line of duty as a police officer on defendants' premises, causing him great pain, emotional anguish, and expenses. Now before the Court is the defendants' motion to exclude plaintiffs' proffered expert's report and testimony, or, in the alternative, for summary judgment. Discovery has been concluded and the Court has carefully considered the submissions of the parties and the oral arguments of counsel. For the reasons stated herein, part of the proffered expert's report will be excluded, and part will not be excluded,

but nevertheless, summary judgment is appropriate and will be granted in defendants' favor.

## I. BACKGROUND

### A. *In General*

Plaintiff, Thomas Bennett, was. injured on October 28, 1995, when searching for an alleged criminal possibly hiding in the utility crawl space below apartment 196 on defendants' premises. Plaintiff fell through the access hole in the floor, which was normally protected by a sturdy cover, which had apparently been pried open and left uncovered in the dark closet in which it was located. Defendant Real Property Services Corp. ("RPS"), a Delaware Corporation, has owned Burlington Manor Apartments ("Burlington"), an apartment complex in Bridgeton, New Jersey, since 1981. (Bernhart Certif. ¶¶ 2, 6.) RPS did not design, plan, layout, or construct the apartment complex, but rather purchased it from a previous owner. (*Id.* at ¶ 7.)

At the time of purchase, the majority of the first floor apartments contained no more than one access hole in the floor, leading to crawlspaces which run the length of the apartments and contain plumbing, heating, electric, and phone equipment. (*Id.* at ¶ 8.) The holes themselves are approximately two feet by two feet in dimension, and they go down approximately three feet. (Gray Certif. ¶ 10.) The access holes, which are located in areas such as closets and other areas not heavily trafficked by people (Bernhart Certif. ¶ 10), are covered by heavy wooden covers, designed to sustain the weight of whatever might be placed upon them (Gray Certif. ¶ 11), and which fit flush with the surrounding floor except for a narrow lip bordering the access hole cover; they do not present a tripping hazard, and they cannot be accidentally or mistakenly removed, but rather must be intentionally pried open. (Bernhardt Certif. at ¶ 9.) The covers are not hinged to the floor or otherwise bolted down. (Posusney Aff. ¶ 6.) They are removed by contractors when work needs to be done to plumbing and sewerage pipes, heater pipes, electric wiring, and telephone wires. (Gray Certif. ¶ 17.)

### B. *The Accident*

The accident and injury to the plaintiff were most unfortunate. On October 28, 1995, at approximately 11:45 a.m., Bridgeton police officer Thomas Bennett (plaintiff) responded to a call at Burlington in order to assist with an incident in which Ms. Lakesha Goldsboro was struck in the head with a board. (Iacovone Certif. Ex. H [Bridgeton Police Report].) Another officer arrested the woman who struck Goldsboro, while plaintiff accompanied Goldsboro to the hospital. (*Id.*) In the meantime, the police learned that another individual, Mr. Doug Taylor, was involved in the altercation, and that Taylor was hiding in Goldsboro's apartment, apartment number 196 at Burlington. (Ott Dep. at 12:12–18; Bennett Aff. ¶ 3.) Plaintiff and Ott went to arrest Taylor. (*Id.*)

They arrived at unit 196 at about 1:30 p.m., and they found another man in the apartment but did not immediately see Taylor. (Bennett Dep. at 33–35; Bennett Aff. ¶¶ 4–6; Ott Dep. at 14–17.) Plaintiff described the mood as excited—Goldsboro was excited and he was rushing. (*Id.*) Eventually, Ott entered through the back door and began searching upstairs; finding nothing, he returned downstairs, and both officers entered the kitchen. (*Id.*) There, the unidentified older man pointed toward a closet or pantry, which both officers understood to mean that Taylor was hiding inside. (*Id.*)

The pantry itself was about three feet deep and about five and ¼ feet in length, and it was configured in such a way that if someone wanted to get to the far right side, he would first have to walk inside the pantry. (Iocovone Certif. Ex. G.) As the officers approached the dark closet (Bennett Dep. at 36; Ott Dep. at 19) slowly and cautiously (Ott Dep. at 18–19), plaintiff saw

that the closet was full of boxes of items which obscured his view of the far right side of the closet, but he entered the closet to see where he thought Taylor might be hiding. (Bennett Dep. at 36–39.) After entering the closet, plaintiff's first footstep went through the open access hole in the closet floor, which had been left uncovered by persons unknown. (*Id.*) Ott lifted Bennett from the hole and checked the closet and the crawl space, but Doug Taylor was gone. (Ott Dep. at 22–23.)

There is no evidence that defendants or defendants' contractors left this access cover open, and, as discussed below, there is no inference that this might be so based on all that is known about these access covers at the Burlington Apartments over the years. Indeed, as discussed, the only available inference is that the apartment dweller (Ms. Goldsboro) or the fleeing perpetrator (Mr. Taylor) had pried the access hole cover open and thereby created the danger to Officer Bennett.

### C. *Access Hole Safety at Burlington*

Burlington and RPS had no knowledge that the access hole was uncovered at the time of the accident. (Gray Certif. ¶ 22.) The access hole in apartment 196, which was uncovered on the day of the accident, was covered when the apartment was rented to Goldsboro, and inspections and maintenance visits to the apartment during her tenancy showed that the access hole cover, as far as RPS, HUD, and the City knew, was never missing or needed to be repaired. (Bernhart Certif. at ¶ 48.)

Jerry Gray, the maintenance supervisor at Burlington at the time of the accident and superintendent for the last eighteen years, testified that he was not aware of any rules or regulations that prohibit tenants from using the access openings. (Lincoln Reply Certif. ¶ 9.) Additionally, there are no warnings written in the apartment that there is an access cover which must remain on at all times. (Iocovone Aff. ¶¶ 12–13.) However, Gray also said that when tenants are shown the apart-

ments when they first move in, they are verbally instructed by the Building Manager about the existence of the access openings and are instructed not to store their property on top of the access openings or to go down into the crawlspace. (Gray Reply Certif. ¶ 5.) In particular, Ms. Lakesha Goldsboro, the tenant of the apartment in question in this case, Apartment 196, was aware, based on her interaction with Mr. Gray, that the access opening was for maintenance purposes and that she was not supposed to take the cover off, go down into the crawlspace, or store property on top of the opening. (*Id.* at ¶ 6.)

According to Ernest Higgs, a building inspector for the City of Bridgeton for the last ten years who has a working knowledge of both the Uniform Construction Code and the 1993 Building Officials and Code Administrators National Building Code ("BOCA Code") (Higgs Aff. for Defs. ¶ 2), the use of trap doors in an apartment building is in a gray area, meaning that no specific code section governs the use of them, but that they must be closed or guarded at all times, for an open, unguarded trap door is a hazard which would violate the Uniform Construction Code. (Higgs Aff. for Pls. ¶ 4.) Mr. Higgs indicated that if he were to observe an open, unguarded trap door at Burlington, he would cite the owner for a violation of the code. (*Id.*) Mr. Higgs also indicated, however, that the access panels that exist at Burlington do not violate any section of the Uniform Construction Code or the 1993 BOCA Code, and that the City of Bridgeton has never cited Burlington for any violation related to the access panels. (Higgs Aff. for Defs. ¶ 3.)

The Burlington apartment complex had been inspected regularly over the years, by the United States Department of Housing and Urban Development ("HUD") (Bernhardt Certif. ¶ 16), by RPS itself when tenants move in and out and on a yearly basis (*id.* at ¶ 17), and by the City of Bridgeton during changeovers of tenants. (*Id.* at ¶ 21.) Never, during any of

those inspections and over the years, have there been reported accidents, complaints, or requests for maintenance with regard to the access panels or their covers in any apartment, (*id.* at ¶ 20; Gray Certif. ¶ 13), and Burlington has never been cited by its own internal inspections, city inspections, HUD inspections, or any other entity's inspection for any violations whatsoever with regard to the access holes or their coverings. (Gray Certif. ¶ 16.)

Moreover, with regard to the specific apartment in question in this case, apartment number 196, HUD and City of Bridgeton inspections conducted between March 2, 1989 and July 28, 1997 indicate that the apartment itself, including the access hole and cover within it, was found to comply with City and HUD building code requirements. (Bernhardt Certif. ¶¶ 25–45 and Exs. A–T.) Kevin C. Rabago, the supervisor for the Department of Housing and Inspections of the City of Bridgeton, testified at his deposition that the City inspected and keeps a file on Apartment 196, and that no complaints of any kind were filed with regard to it. (Rabago Dep. 12:12–22.) No defects or violations have ever been found in Apartment 196 during any of inspections that the City made, and, accordingly, no notice of violation was sent out and no violations were listed in Burlington's permanent record. (*Id.* at 18:14–23.) No complaints, concerns, or violations regarding the access hole or its cover in Apartment 196 were lodged in any of those years. (Bernhart Certif. at ¶ 45.)

### D. *Procedural Background*

Plaintiffs Thomas Bennett and his wife Bonnie Bennett filed the instant Complaint in this Court on October 27, 1997, seeking damages for defendants' alleged negligence in failing to give proper notice and warning of the existence of a dangerous condition in the building, namely the uncovered access hole in Burlington apartment 196.[1] The defendants filed an Answer on December 31, 1997 (as per a stipulation for an extension of time) denying all of the allegations in the Complaint. On September 30, 1998, Magistrate Judge Joel B. Rosen removed this matter from arbitration. Pretrial factual discovery was to close on November 30, 1998.

As part of that discovery, plaintiffs submitted the report of their proffered expert, John E. Posusney, P.E., a consulting engineer. Posusney has a B.S. in Civil Engineering from Drexel University, has taken graduate courses in Civil Engineering at George Washington University, and received a Master of Science in Civil Engineering from Drexel. (Posusney Aff. ¶ 2.) He is licensed as a Professional Engineer in New Jersey, New York, and Florida, and he belongs to professional societies such as the Building Officials and Code Administrators ("BOCA"), the American Society of Civil Engineers ("ASCE"), and the American Concrete Institute ("ACI"). (*Id.*) He states that he has specialities in BOCA building code compliance and OSHA compliance, as well as civil design, building design, and construction, both through his education and as a practicing engineer. (*Id.* at ¶ 3.)

On January 17, 1997, prior to discovery in this case, Posusney accompanied plaintiff to unit 196 while plaintiff briefly explained the accident. (*Id.* ¶ 5.) Posusney examined the closet and the access hole through which plaintiff fell. (*Id.*) Based on his conversation with plaintiff and his view of the access hole and the cover, Posusney opined that an uncovered floor opening is a foreseeable hazardous or dangerous condition. (*Id.* Ex. B. at 3.) He stated that the 1993 BOCA Code, Section 1005.5, requires guards around an open-sided walking surface more than thirty inches above the floor, such as the floor of the pantry, which is more than thirty inches above the crawl

---

1. Plaintiff Bonnie Bennett seeks damages for loss of consortium, a claim which is derivative of her husband's causes of action.

space floor. (*Id.* at 2.) He also states that OSHA regulations, which he believes to be applicable to this 'case because the access hole is part of the work place for RSA employees, would require that floor holes be guarded. (*Id.*) Based on that, Posusney states that something should be done to protect those who may unwittingly fall victim to the danger, such as warning or installing a guard. In his view, the access hole cover was an inadequate measure because it was not bolted down or hinged. Had it been, he says, the accident could have been avoided. (*Id.* at 3.) Therefore, the accident in apartment 196 was a foreseeable consequence of the "unguarded floor opening." (*Id.*)

Defendants filed a motion seeking to strike the opinion of Mr. Posusney and/or for summary judgment. For the reasons stated herein, defendants' motion to exclude Posusney's engineering expert report will be denied, but summary judgment will be granted in favor of defendants because, under the circumstances of this accident, no reasonable jury could find that any alleged deficiency in the design or inspection of this access door was a substantial factor in causing plaintiff's injuries.

## II. DISCUSSION

### A. *The Expert's Report*

■ The United States Supreme Court has made it clear that the Federal Rules of Evidence require the trial judge to act as a "gatekeeper" of expert testimony, to ensure that expert testimony is only admitted if it meets the requirements of Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may

testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. In determining whether plaintiffs' expert testimony will "assist the trial of fact to understand the evidence or to determine a fact in issue," we must consider whether the testimony is (a) relevant, and (b) reliable. *See Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. The relevance of the testimony is "determined by inquiring as to whether there is a good "fit" between the testimony and the factual question at issue." *Id.* at 591, 113 S.Ct. 2786.

In *Fedorczyk v. Caribbean Cruise Lines, Ltd.,* 82 F.3d 69, 75 (3d Cir.1996), the Third Circuit stated that

An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts. In order for an expert opinion to be admissible, the technique the expert employs in formulating an opinion must be reliable. In contrast, if an expert opinion is based on speculation or conjecture, it may be stricken.

*Id.* (internal citations omitted). Here, Mr. Posusney's opinion is based upon his understanding that the BOCA Code, the National Safety Council, and the Occupational Safety and Health Administration ("OSHA") all require guards to be placed on floor openings such as the access hole here, as well as upon his experience as a practitioner in this area.

■ His reliance on BOCA, OSHA, and the National Safety Council is misplaced, for the cited OSHA regulations, BOCA Codes, and National Safety Council suggestion do not apply under the facts present here. Mr. Posusney states that OSHA regulations found at 29 C.F.R. § 1926.500 and 29 C.F.R. § 1910.23 recognize "the danger of floor holes that a person can accidentally fall into and requires that such openings be guarded as to prevent such an occurrence." (Posusney Aff. Ex. B at 2.) OSHA regulations, however, set safety standards in *work places,* not residential

dwellings. *Pub.L.* No. 91–596, § 2, 84. Stat. 1590, § 4, 67 Stat. 462 (1970); *Dawson v. Bunker Hill Plaza Assoc.*, 289 N.J.Super. 309, 321, 673 A.2d 847 (App. Div.), *cert. denied*, 146 N.J. 569, 683 A.2d 1164 (1996) (citing *Meder v. Resorts International Hotel, Inc.*, 240 N.J.Super. 470, 573 A.2d 922 (App.Div.1989), *cert. denied*, 121 N.J. 608, 583 A.2d 310 (1990)). Mr. Posusney argues in his affidavit that OSHA regulations do apply here because "the employees of Real Property Services and their subcontractors do use the access hole and Real Property keeps exclusive control over the access holes. Therefore, the access hole is part of the work place for those employees." (Posusney Aff. ¶ 10.) If the fact that maintenance workers come into one's home to fix utilities is enough to transform one's home into the workplace, however, then there is no distinction between a residential dwelling and a workplace, and OSHA has no limits. That was not Congress' intent in creating OSHA, and the OSHA regulations simply do not apply in this context. Mr. Posusney's reliance upon the OSHA regulations in this setting is thus irrelevant and unreliable and will be stricken.

■ Likewise, Mr. Posusney cites to 1993 BOCA Section 1005.5 for the proposition that BOCA requires guards to be located along open-sided walking surfaces that are more than 30 inches above the floor below, and he opines that section 1005.5 is applicable here because the access hole is more than 30 inches above the floor of the crawl space. (Posusney Aff. at ¶ 9.) It is true that section 1005.5 does require guards along open-sided walkways. However, the access hole in Apartment 196 was not an open-sided walking surface, but a utility access hole, usually fitted with a cover, in a storage closet. That an access hole is different than a walking surface is further confirmed by the BOCA regulations themselves, which, at section 1005.2, regulates floor openings such as manholes and floor access panels. (See Lincoln Certif. Ex. I.) Therefore, the par-

ticular cited BOCA regulation does not require a guard to be placed around this access panel. The report's reference to the BOCA Code will therefore be stricken as irrelevant.

■ Mr. Posusney also cites to the National Safety Council's recognition, in Data Sheet I–747, that guardrails can be used to protect floor openings. (Posusney Aff. Ex. B. at 2; Lincoln Certif. Ex. I [Data Sheet at p. 3, figure 3].) The National Safety Council's recommendations, however, are designed to protect workers on construction projects so that they do not fall through unguarded floor openings, wall openings, platforms, and open-sided floors, and the data sheet names the "most practical means for providing protection" on construction sites. (Lincoln Certif. Ex. I [Data Sheet at p. 1].) The recommendations do not speak to the protection of individuals in residential units with permanent access holes that are not left unguarded, but rather are protected by access panels. Like OSHA regulations, these National Safety Council standards simply are not directed at setting standards outside of the construction or industry settings, and they do not apply here; the report's reference to them will be excluded from evidence.

Therefore, to the extent that Mr. Posusney's opinion as described in his report is based upon the cited provisions of the National Safety Council, BOCA Code, and OSHA, his opinion is without support because his opinion cannot be grounded in irrelevant code sections. However, unlike in *Fedorczyk*, in which the expert opinion was based upon nothing but speculation or conjecture, 82 F.3d at 75, Mr. Posusney's opinion does have a basis: his years of experience and engineering knowledge. According to Mr. Posusney, "generally accepted safety practice requires that something be done to protect those individuals who may unwittingly fall victim to the foreseeable dangers of open floor holes," and so engineers engage in Accident Hazard Analysis to determine how best to

mitigate the possible dangers. (Posusney Aff. ¶ 11.) Based on such an analysis, Mr. Posusney determined that, "[a]t a minimum, it is my opinion that the cover should have been hinged.... [A] hinged cover would have acted as a guard, preventing Mr. Bennett's fall." (*Id.* at ¶ 12.) The hinge serves the function of joining one side of the cover to the floor so that it swings open to reveal the opening.

■ To the extent, then, that Mr. Posusney's opinion that a hinged cover on the access hole would have prevented plaintiff's fall is based upon his own experience as an engineer and his knowledge of standard engineering practices for residential floor access panels, it has a reliable basis, and it is admissible under Rule 702, Fed. R.Civ.P. While I do grant defendants' motion to exclude Mr. Posusney's report to the extent that it may not contain references to the cited BOCA, OSHA, and National Safety Council provisions, the report will not be excluded in its entirety, and Mr. Posusney's opinion that the access hole cover failed to conform to accepted engineering standards because it was unhinged will be considered admissible evidence.

### B. *Summary Judgment*

In addition to seeking to exclude Mr. Posusney's report, defendants argue that this Court should grant summary judgment to the defendants. Having agreed that plaintiffs' expert's opinion that prudent safety practices requiring the access hole cover to be hinged to the floor is admissible,[2] the Court next considers whether material factual disputes preclude granting summary judgment.

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Hersh v. Allen Prods.*

*Co.*, 789 F.2d 230, 232 (3d Cir.1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir.1996); *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

■■ Under New Jersey law, negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, when prompted by a consideration which ordinarily regulates the conduct of human affairs. It is, in other words, the failure to use ordinary care under the circumstances in the management of one's person or property, or of agencies under one's control.

■■ In order for a plaintiff to prevail on a negligence claim, he or she must prove that the defendant's negligence caused the injury complained of. *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir.1996) (citing *Kulas v. Public Serv. Elect. & Gas Co.*, 41 N.J. 311, 196 A.2d 769 (1964)). Under New Jersey law, "[t]he plaintiff must introduce evi-

---

2. It is admissible only to the extent that it is based on his general knowledge and experience. It is not admissible as evidence that

any code provisions or regulations were violated because the access hole covers were not hinged to the floor.

dence which provides a reasonable basis for the conclusion that it was more likely than not that the negligent conduct of the defendant was a cause in fact of the injury." *Fedorczyk,* 82 F.3d at 74. Causation consists of both causation in fact, meaning that the particular event would not have occurred without the defendant's act or omission, and legal causation, otherwise known as proximate cause. W. Page Keeton, et al., *Prosser and Keeton and the Law of Torts,* § 41, at 263 (5th Ed.1984 ("Prosser")).

Thus, in order to win their negligence case here, plaintiffs must prove that defendants breached some standard of care and that such breach was an actual and legal cause of the harm which came to the defendant.[3] Plaintiffs, of course, have the burden of proof on each of these elements. Plaintiffs here have presented no evidence to meet that burden on the issue of causation.

■■■■■ The duty of care owed by an owner or occupier of land to third persons coming on to that land is determined according to the status of that third person, *i.e.,* whether that person is an invitee, licensee, or trespasser. The duty of care owed to an invitee is to use reasonable care to make the premises safe, and that includes a duty to make reasonable inspections to discover defective conditions. *Brody v. Albert Lifson & Sons,* 17 N.J. 383, 388, 111 A.2d 504 (1955); *Benedict v. Podwats,* 109 N.J.Super. 402, 407, 263 A.2d 486 (App.Div.), *aff'd,* 57 N.J. 219, 271 A.2d 417 (1970) (citing *Handleman v. Cox,* 39 N.J. 95, 111, 187 A.2d 708 (1963)). The duty owed to a licensee, on the other hand, is merely restraint from wilfully injurious acts, *Snyder v. I. Jay Realty Co.,* 30 N.J. 303, 316, 153 A.2d 1 (1959), or, where there is a known dangerous condition on the premises which the occupier could reasonably anticipate that his licensee would not observe and avoid, he must either give warning or make the condition reasonably safe. *Id.*

■■■■■ The law in New Jersey as to the status of public officials such as police officers when they enter the land is not firmly established. *Cella v. Interstate Properties,* 232 N.J.Super. 232, 239, 556 A.2d 1262 (App.Div.1989) (a police or fire officer responding to a call or investigating a suspicious circumstance may be considered an invitee, licensee, or even a trespasser). Here, however, even assuming that the highest duty applies as to an invitee—to exercise reasonable care in correcting or mitigating against known or reasonably discovered dangerous or defective conditions on property, see *Kane v. Hartz Mountain Indus., Inc.,* 278 N.J.Super. 129, 140, 650 A.2d 808 (App.Div.1994), *aff'd,* 143 N.J. 141, 669 A.2d 816 (1996)—no reasonable jury could find that RPS fell below the standard of care owed to an invitee.

The definition of what would constitute reasonable care in any given situation is based largely on foreseeability. It is not unreasonable for a person not to take certain steps if it is not reasonably foreseeable that an event will occur unless those steps are taken, and the mere "possibility of the existence of an event does not tend to prove its probability." See *Fedorczyk,* 82 F.3d at 75 (citing *Dombrowska v. Kresge–Newark, Inc.,* 75 N.J.Super. 271, 183 A.2d 111 (App.Div.1962)). Here, it was simply not foreseeable to defendants that someone other than subcontractors would remove the access hole cover in Apartment 196, and defendants' failure to use a hinged cover to the access hole was not an exercise of unreasonable care.

RPS did not provide an uncovered hole in the middle of each apartment. Rather, it owned a building with one access hole in each first floor apartment, and that hole was protected by a panel which fit flush with the floor and which could not be moved accidentally. Access in Apartment 196 was through the floor of a storage

---

**3.** Plaintiffs must also prove damages, and here they have done so.

closet. Inspections conducted between the time the apartment was rented and plaintiff's accident, including those performed by the City of Bridgeton and HUD, established that the access hole in Apartment 196 had its cover in place. Defendants were never advised that the cover had been removed or was defective. No accidents having to do with access holes previously occurred in the entire time the defendants owned Burlington, and the hole covers did not violate any applicable code. Moreover, defendants had never been advised that anyone, other than the subcontractors who worked in the crawl space below, ever moved the access hole covers or even had reason to move them. There is no evidence that such access panels were ever misplaced or even dislodged in the past. It was simply not foreseeable that someone other than those contract workers under RPS' control would take purposeful steps to pry open and remove and displace the cover in unit 196, and defendants could not be required to do more than they did to make the possibly dangerous condition safe.

 For the same reason, there is no evidence that defendants' actions or omissions were the cause in fact of the injury to plaintiff Officer Bennett. Proof of causation may in fact "rest upon legitimate inference, so long as the proof will justify a ... logical inference as distinguished from mere speculation." *Kulas*, 41 N.J. at 311, 196 A.2d 769 (internal quotation marks and citations omitted).

That logical inference is not justified here. The factual record is simply devoid of any evidence that the accident was caused by defendants' failure to install hinges on the access opening cover. As plaintiffs themselves point out in their brief, there is no evidence that the defendants themselves, or anyone under their

control, removed the access cover in unit 196, and, most likely, it was removed either by Doug Taylor "as he made his getaway, or alternatively, the tenant Lakesha Goldsboro had removed it some time before." (Pls.' Br. at 3–4.) Neither Taylor nor Goldsboro have been deposed in this case. Neither Taylor nor Goldsboro were under defendants' control, and it is not disputed that defendants had orally warned Goldsboro not to remove the cover. It was not foreseeable that either of them would purposely remove the access hole cover in the closet floor.[4] Nor would using a cover with hinges instead of one that was completely removable have prevented the accident here. Officer Bennett entered a dark closet, in which he could not see, and did not turn on any lights. That the cover was resting open upon its hinge instead of completely set aside would not have prevented plaintiff from falling. There can be no doubt that the open access hole was a substantial cause of plaintiff's injury. Nonetheless, the Court finds that whether hinged or unhinged, the open protective cover would have exposed Officer Bennett to the very same risk of stepping into the opening to the utility space below in the dark closet.

As unfortunate as this occurrence may be, in which a law enforcement officer acting responsibly to protect the public in the course of his duties is injured, the defendants may only be held liable if some breach of duty by them was a substantial factor in bringing about the harm to plaintiff. Upon the evidence proffered by plaintiff and all reasonable inferences in plaintiff's favor, the Court finds no basis on which the jury could reasonably find that defendants failed in their duty to inspect these premises and to correct or mitigate against the dislodging and removal of the utility access panel covers, since defendants had no notice, whether actual

---

4. Moreover, RPS is not deemed to be in control of the access hole just because only its employees and contractors could enter the utility crawl space through the access hole or because the signed lease between Goldsboro

and RPS allowed RPS to enter the apartment for repair upon notice or in the even of an emergency, as plaintiffs suggest. (See Lease, Iocovone Certif. Ex. C ¶ 24.)

or constructive, that such a problem might exist. Moreover, even if defendants, in theory, could have rendered the access panel cover more safe by installing hinges upon it, there is simply no evidence that their failure to have done so made any difference in the actual happening of this accident.

Thus, plaintiffs have not met their burden of coming forward with evidence to create a genuine issue of material fact as to whether defendants breached a duty of care and as to whether defendants' omissions were the cause of Officer Bennett's accident. Because plaintiffs cannot make out their case, summary judgment is appropriate.

## III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion in part to exclude those portions of plaintiffs' expert's report which contain opinions premised upon BOCA, OSHA, and National Safety Council standards inapplicable to the circumstances of this case, but the Court denies defendants' motion to exclude the opinions that good construction and design practice requires that hinges should be included upon the access panel cover in this closet floor. The Court nonetheless has found that defendants are entitled to summary judgment in their favor because no reasonable juror could find that defendants failed to make reasonable inspections of the premises, nor that the removal of the access cover was reasonably foreseeable, nor that the installation of hinges upon this cover would have likely prevented this accident. The accompanying Order is entered.

### ORDER

This matter having come before the Court upon defendants' motion to exclude the proffered expert report of John E. Posusney and for summary judgment; and the Court having considered the submissions of the parties; and for the reasons stated in the Opinion of today's date;

IT IS this day of September, 1999, hereby

ORDERED that defendants' motion to exclude the report of John E. Posusney be, and hereby is, *GRANTED IN PART*, to the extent that it is based upon BOCA, OSHA, and National Safety Council standards, and *DENIED IN PART*, to the extent that it expresses the opinion that, based on Mr. Posusney's experience, prudent design of the access cover should have included hinges; and it is

ORDERED that defendants' motion for summary judgment be, and hereby is, *GRANTED*; and *JUDGMENT* is entered in defendants' favor.